IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IDENIX PHARMACEUTICALS, INC., UNIVERSITA DEGLI STUDI DI CAGLIARI, CENTRE NATIONAL DE LA RECHERCHE SCIENTIFIQUE and L'UNIVERSITÉ MONTPELLIER II,<br><br>Plaintiffs,<br><br>v.<br><br>GILEAD SCIENCES, INC. and GILEAD PHARMASSET LLC,<br><br>Defendants. | C.A. No. 13-1987-LPS-CJB |
| IDENIX PHARMACEUTICALS, INC. and UNIVERSITA DEGLI STUDI DI CAGLIARI,<br><br>Plaintiffs,<br><br>v.<br><br>GILEAD SCIENCES, INC.,<br><br>Defendant. | C.A. No. 14-846-LPS-CJB |

**PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF**

*Of Counsel*:

Calvin P. Griffith
Ryan B. McCrum
Michael S. Weinstein
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939

Anthony M. Insogna
John D. Kinton
JONES DAY
12265 El Camino Real, Suite 200
San Diego, CA 92130
(858) 314-1200

John M. Michalik
JONES DAY
77 West Wacker
Chicago, IL 60601
(312) 782-3939

Dated: June 23, 2015

Steven J. Balick (#2114)
John G. Day (#2403)
Andrew C. Mayo (#5207)
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
amayo@ashby-geddes.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1

BACKGROUND AND OVERVIEW OF THE TECHNOLOGY ..... 2

- A. Idenix's Research Led To Pioneering Patents For The Treatment Of HCV ..... 2
- B. Modified Nucleosides Disclosed And Claimed By The Asserted Patents ..... 3

ARGUMENT ..... 4

- A. β-D-2'-C-branched pyrimidine nucleoside ('054 Patent – Claim 25) ..... 4
- B. β-D-2'-C-branched pyrimidine ribonucleoside ('054 Patent – Claim 26) ..... 9
- C. β-D-2'-methyl-ribofuranosyl nucleoside ('597 Patent - Claim 1) ..... 14
- D. nucleoside ('054 Patent - Claim 24; '597 Patent – Claim 1) ..... 15
- E. administering ('054 Patent - Claims 25 And 26; '597 Patent – Claim 1; '600 Patent - Claim 1) ..... 18
- F. leaving group ('600 Patent - Claims 1 And 50) ..... 22

CONCLUSION ..... 25

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Abbott Labs. v. Baxter Pharm. Prods., Inc.*,
334 F.3d 1274 (Fed. Cir. 2003)....................4, 5

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
659 F. 3d 1121 (Fed. Cir. 2011)....................7, 8

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003)....................20

*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359 (Fed. Cir. 2002)....................7

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC.*,
677 F.3d 1361 (Fed. Cir. 2012)....................7

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*,
460 F.3d 1349 (Fed. Cir. 2006)....................7

*GE Lighting Solutions, LLC. v. AgiLight, Inc.*,
750 F.3d 1304 (Fed. Cir. 2014)....................8

*Gilead Sciences, Inc. v. Merck & Co.*,
No. 13-CV-04057-BLF, 2015 WL 2062575 (N.D. Cal. May 1, 2015)....................22

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
381 F.3d 1352 (Fed. Cir. 2004)....................7

*Honeywell Int'l, Inc. v. Nikon Corp.*,
589 F. Supp. 2d 433 (D. Del. 2008)....................7

*InterDigital Commc'ns, LLC v. U.S.I.T.C.*,
690 F.3d 1318 (Fed. Cir. 2012)....................7

*LG Philips LCD Co. v. Tatung Co.*,
No. 04-343-JJF, 2007 WL 5787789 (D. Del. June 15, 2007)....................7

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004)....................7, 8

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Merck & Co. v. Teva Pharms. USA, Inc.*,
47 F.3d 1367 (Fed. Cir. 2003)....................21

*Netcraft Corp. v. eBay, Inc.*,
549 F.3d 1394 (Fed. Cir. 2008)....................6

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
348 F. Supp. 2d 713 (N.D. W. Va. 2004)....................21

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc)....................10, 14

*Schering Corp. v. Geneva Pharms., Inc.*,
339 F.3d 1373 (Fed. Cir. 2003)....................21

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)....................10, 11, 15

*Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*,
19 F.3d 1418 (Fed. Cir. 1994)....................21

## IDENIX'S EXHIBITS

| Exhibit | Description |
|---|---|
| 1 | U.S. Patent No. 6,914,054 (Sommadossi, et al.) |
| 2 | U.S. Patent No. 7,608,597 (Sommadossi, et al.) |
| 3 | U.S. Patent No. 7,608,600 (Storer, et al.) (excerpt) |
| 4 | June 6, 2003 Amendment (USSN 09/864,078) |
| 5 | August 26, 2003 Amendment (USSN 09/864,078) |
| 6 | October 31, 2003 Amendment (USSN 09/864,078) |
| 7 | February 19, 2004 Notice of Allowance (USSN 09/864,078) |
| 8 | August 27, 2003 Office Action (USSN 09/864,078) |
| 9 | Excerpt of Application as filed on May 23, 2001 (USSN 09/864,078) |
| 10 | U.S. Provisional Application No. 60/474,368, as filed on May 30, 2003 |
| 11 | U.S. Patent No. 7,601,820 (Wang, et al.) |
| 12 | U.S. Patent No. 7,429,572 (Clark) |
| 13 | Excerpt of Dr. Stanislaw F. Wnuk's June 12, 2014 Deposition Transcript from Interference No. 105,981 |
| 14 | Excerpt of Dr. Stanislaw F. Wnuk's January 13, 2015 Trial Testimony from Canadian Litigation T-1156-12 |
| 15 | U.S. Patent No. 7,964,580 (Sofia, et al.) |
| 16 | Definition of "*in vivo*" from The Sloane-Dorland Annotated Medical-Legal Dictionary (West Publishing Co. 1987) |
| 17 | Definition of "administering" from the Oxford English Dictionary (3rd ed. 2011) |
| 18 | V.J. Stella, et al., "Prodrugs. Do They Have Advantages in Clinical Practice?," *Drugs 29*, 455-473 (1985) |
| 19 | Hostetler, et al., "Synthesis and Antiretroviral Activity of Phospholipid Analogs of Azidothymidine and Other Antiviral Nucleosides," *J. Biological Chemistry 265*(11), 6112-17 (April 15, 1990) |
| 20 | Jones, et al., "Minireview: Nucleotide Prodrugs," *Antiviral Research 27*, 1-17 (1995) |
| 21 | Meier, et al., "Cyclic Saligenyl Phosphotriesters of 2',3'-Dideoxy-2',3'-Didehydrothymidine (d4T) - A New Pro-Nucleotide Approach," *Bioorganic & Medicinal Chemistry Letters 7*(2), 99-104 (1997) |
| 22 | McGuigan, et al., "Phosphoramidate Derivatives of d4T With Improved Anti-HIV Efficacy Retain Full Activity in Thymidine Kinase-Deficient Cells," *Bioorganic & Medicinal Chemistry Letters 6*(10), 1183-86 (1996) |

## TABLE OF ABBREVIATIONS

| Term | Abbreviation |
|---|---|
| U.S. Patent No. 6,914,054 | the '054 patent |
| U.S. Patent No. 7,608,597 | the '597 patent |
| U.S. Patent No. 7,608,600 | the '600 patent |
| U.S. Patent Nos. 6,914,054, 7,608,597 and 7,608,600 | the Asserted Patents |
| Idenix Pharmaceuticals, Inc., Universita Degli Studi Di Cagliari, Centre National De La Recherche Scientifique, and L'Université Montpellier II | Idenix |
| Gilead Sciences, Inc. and Gilead Pharmasset, LLC | Gilead |
| Pharmasset, Inc. | Pharmasset |
| The Hepatitis C virus | HCV |
| The United States Patent and Trademark Office | the Patent Office |

## SUMMARY OF TERMS TO BE CONSTRUED

| Term To Be Construed | Patent(s) And Claim(s) In Which Term Appears | Relevant Claim Language |
|---|---|---|
| β-D-2'-C-branched pyrimidine nucleoside | '054 (claim 25) | '054 patent, claim 25<br><br>A method for treatment of a Hepatitis C virus infection in a host in need thereof, comprising administering to said host an antivirally effective amount of a **β-D-2'-C-branched pyrimidine nucleoside** |
| β-D-2'-C-branched pyrimidine ribonucleoside | '054 (claim 26) | '054 patent, claim 26<br><br>A method for treatment of a Hepatitis C virus infection in a host in need thereof, comprising administering to said host an antivirally effective amount of a **β-D-2'-C-branched pyrimidine ribonucleoside** |
| β-D-2'-methyl-ribofuranosyl nucleoside | '597 (claim 1) | '597 patent, claim 1<br><br>A method for the treatment of a hepatitis C virus infection, comprising administering an effective amount of a purine or pyrimidine **β-D-2'-methyl-ribofuranosyl nucleoside** or a phosphate thereof, or a pharmaceutically acceptable salt or ester thereof |
| Nucleoside | '054 (claim 25) and '597 (claim 1) | '054 patent, claim 25<br><br>A method for treatment of a Hepatitis C virus infection in a host in need thereof, comprising administering to said host an antivirally effective amount of a β-D-2'-C-branched pyrimidine **nucleoside**<br><br>'597 patent, claim 1<br><br>A method for the treatment of a hepatitis C virus infection, comprising administering an effective amount of a purine or pyrimidine β-D-2'-methyl-ribofuranosyl **nucleoside** or a phosphate thereof, or a pharmaceutically acceptable salt or ester thereof |
| Administering | '054 (claims 25 and 26), '597 (claim 1) and '600 (claim 1) | '054 patent, claim 25<br><br>A method for treatment of a Hepatitis C virus infection in a host in need thereof, comprising **administering** to said |

| Term To Be Construed | Patent(s) And Claim(s) In Which Term Appears | Relevant Claim Language |
|---|---|---|
| | | host an antivirally effective amount of a β-D-2'-C-branched pyrimidine nucleoside<br><br><u>'054 patent, claim 26</u><br><br>A method for treatment of a Hepatitis C virus infection in a host in need thereof, comprising **administering** to said host an antivirally effective amount of a β-D-2'-C-branched pyrimidine ribonucleoside<br><br><u>'597 patent, claim 1</u><br><br>A method for the treatment of a hepatitis C virus infection, comprising **administering** an effective amount of a purine or pyrimidine β-D-2'-methyl-ribofuranosyl nucleoside or a phosphate thereof, or a pharmaceutically acceptable salt or ester thereof<br><br><u>'600 patent, claim 1</u><br><br>A method for the treatment of a host infected with a hepatitis C virus, comprising **administering** to the host infected with a hepatitis C virus an effective amount of a compound having the formula . . . |
| Leaving group | '600 (claims 1 and 50) | <u>'600 patent, claim 1</u><br><br>A method for the treatment of a host infected with a hepatitis C virus, comprising administering to the host infected with a hepatitis C virus an effective amount of a compound having the formula:<br><br><br><br><br>* * *<br><br>wherein $R^1$ is H; mono-, di- or triphosphate; acyl; an amino acid ester; a carbohydrate; a peptide; or a |

| Term To Be Construed | Patent(s) And Claim(s) In Which Term Appears | Relevant Claim Language |
| --- | --- | --- |
| | | pharmaceutically acceptable **leaving group** which when administered in vivo provides a compound wherein $R^1$ is H or phosphate; |

# INTRODUCTION

For each of the six claim terms in dispute, a common theme pervades the parties' respective claim construction positions.[1] Idenix offers constructions that are explicitly supported by the intrinsic evidence, and that accord with well-established claim construction principles. Gilead, by contrast, offers self-serving, result-oriented constructions untethered to the intrinsic record. Indeed, for every single term in dispute, Gilead reads in one or more limitations, solely in an attempt to dodge a clear-cut case of infringement.

For example, the term "administering" has a plain and ordinary meaning of "providing." Yet Gilead asks this Court to construe this term to mean "providing ***externally***" and to expressly exclude "metabolites . . . created by *in vivo* transformation." Similarly, while the parties generally agree that the term "leaving group" includes "one or more atoms that are cleaved," Gilead reads in that a group of atoms must be "cleaved ***in its entirety***." The parties also generally agree on the meaning of "nucleoside," except that Gilead reads in a limitation requiring hydroxyl (*i.e.*, OH) at the 5' position. With regard to the remaining three terms – "β-D-2'-C-branched pyrimidine nucleoside," "β-D-2'-C-branched pyrimidine ribonucleoside" and "β-D-2'-methyl-ribofuranosyl nucleoside" – the parties agree that they require "two non-hydrogen substituents at the 2' position," but Gilead reads in limitations requiring either "no fluorine at the 2' down position" or "hydroxyl groups at the 2' down and 3' down positions."

Idenix's constructions do not read in limitations and are firmly supported by the intrinsic record. Idenix respectfully requests that its constructions be adopted.

---

[1] Idenix is asserting infringement of two separate patent families (one includes the '054 and '597 patents (Exhs. 1 and 2, respectively), and the other the '600 patent (Exh. 3)). These families have different filing dates, different specifications, different prosecution histories, and different inventive entities. The two patent families are being asserted in two separate, unconsolidated cases, but for the Court's convenience, Idenix agreed to submit a single brief.

# BACKGROUND AND OVERVIEW OF THE TECHNOLOGY

## A. Idenix's Research Led To Pioneering Patents For The Treatment Of HCV

In response to the need for an effective treatment for hepatitis C, Dr. Jean-Pierrre Sommadossi founded a company in the late 1990s that later became Plaintiff Idenix Pharmaceuticals, Inc. Dr. Sommadossi, working with Professor Paolo La Colla from Universita Degli Studi Di Cagliari and other scientists, developed a number of new drug candidates to treat HCV. HCV is a devastating, life-threatening disease that afflicts millions of people, and can lead to liver disease, liver cancer, and even death. Over the course of several years, this work led to several breakthrough inventions that are transforming the treatment—and more importantly, the prognosis—of patients suffering from HCV. Indeed, these innovations continue to be used today not only by Idenix and Gilead but by many other companies. Their work also led to a number of distinct patent families that claimed various inventions centered on the treatment of HCV.

One of those patent families includes the '054 and '597 patents, which are asserted against Gilead in C.A. No. 14-846-LPS. These two patents are related (the '597 patent is a continuation of the '054 patent). The '054 and '597 patents were pioneering in the field of treating HCV, sparking many other companies (*e.g.*, Gilead, Pharmasset, Roche, Gene Labs, and Ribapharma) to develop treatments for HCV based on Idenix's inventions. In particular, Idenix's discovery that nucleosides having methyl ($-CH_3$) at the 2' up position are active against HCV became the focus of nearly all subsequent attempts to develop nucleosides for the treatment of HCV, including Pharmasset's (a company now owned by Gilead). A second Idenix patent family that built off Idenix's initial work includes the '600 patent, which is being asserted against Gilead in C.A. No. 13-1987-LPS. It too is directed to methods of treating HCV using nucleosides having a specific substitution pattern at the 2' position, specifically the methyl up and fluorine down combination.

After Dr. Sommadossi and Professor La Colla filed their first application covering their ground-breaking work, Raymond Schinazi, co-founder of Pharmasset, became aware of Dr. Sommadossi's and his colleagues' innovative anti-HCV research. Soon thereafter, Pharmasset began developing drug candidates (including what became sofosbuvir, the accused drug in this case) that were based on the Idenix methyl up nucleosides. Pharmasset was eventually acquired by Gilead Sciences, Inc., which obtained FDA approval for sofosbuvir on December 6, 2013.

### B. Modified Nucleosides Disclosed And Claimed By The Asserted Patents

The Asserted Patents relate to methods for treating HCV by administering modified nucleosides. Nucleosides are compounds having a sugar linked to a base. They are commonly shown two-dimensionally to convey their three-dimensional aspects using a Haworth projection:




The portion in red, including the vertices numbered 1', 2', 3', 4' and 5', represent the sugar. The five-sided pentagon is the sugar ring. Each of the numbered vertices 1'-5' represents a carbon atom. The five sides of the pentagon represent chemical bonds between adjacent carbon atoms or adjacent carbon and oxygen atoms.

Carbon atoms can form up to four bonds. Accordingly, additional substituents (*e.g.*, atoms or molecules) can be attached to the sugar ring. A substituent above the plane of the sugar ring is referred to as being in the "up" position. A substituent below the plane of the sugar ring is referred to as being in the "down" position.

**Ribo**nucleosides are a subset of nucleosides that have non-hydrogen substituents attached at the 2' and 3' down positions. In a ***natural*** ribonucleoside, OH is the specific non-hydrogen

substituent at both the 2' and 3' down positions (first figure below), but natural ribonucleosides can be modified to substitute other atoms at those positions and others (second figure below).







## ARGUMENT

### A. β-D-2'-C-branched pyrimidine nucleoside ('054 Patent – Claim 25)[2]

| Idenix's Proposed Construction | Gilead's Proposed Construction |
|---|---|
| A β-D-pyrimidine nucleoside having two non-hydrogen substituents at the 2' position, at least one of which is connected at the 2' position through a carbon-to-carbon bond. | A β-D pyrimidine nucleoside with two non-hydrogen substituents at the 2' position, at least one of which is connected at the 2' position through a carbon-to-carbon bond, and no fluorine at the 2' down position. |

The parties' proposed constructions are identical with one exception: Gilead improperly reads in the negative limitation "and no fluorine at the 2' down position." The plain and ordinary meaning of this disputed phrase does ***not*** exclude fluorine at the 2' down position. To read Gilead's proposed negative limitation into the claim, Gilead must show that the '054 patent specification and/or prosecution history use "'words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.'" *Abbott Labs. v. Baxter Pharm. Prods., Inc.*, 334 F.3d 1274, 1278-79 (Fed. Cir. 2003) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002)). Gilead cannot make this showing.

Looking at each individual part of this term firmly establishes that the term in its entirety does not exclude fluorine at the 2' down position. Neither "β" nor "D" relates to fluorine. These

[2] A table is provided above on pages iv and v, which lists the six terms to be construed and recites the relevant claim language in which those terms appear.

terms simply refer to the positions of the base and the 5' carbon relative to the sugar ring. "2'-C branched" is understood to mean that there is at least one non-hydrogen substituent forming a carbon-to-carbon bond with the carbon at the 2' position.[3] "Pyrimidine nucleoside" means that the base is a pyrimidine. None of the plain meanings of these well-understood terms is disputed by Gilead, and none excludes fluorine at the 2' down position. Furthermore, neither the specification nor the prosecution history includes "words of manifest exclusion or restriction" justifying Gilead's proposed exclusion of fluorine. *Abbott Labs.*, 334 F.3d at 1278-79.

In fact, just the opposite is true. Starting with the prosecution history, applicants advised the Patent Office on ***multiple occasions*** that "the core of the invention" is "a <u>pyrimidine nucleoside</u> that has <u>two non-hydrogen</u> substituents" (*e.g.*, fluorine) at the 2'-position:

> The unifying concept of the remaining claims is that each is a <u>pyrimidine nucleoside</u> that has <u>two non-hydrogen</u> substituents in the 2'-position of the nucleoside, which represents the core of the invention.

(*See, e.g.,* Exh. 4 at 11 (emphasis in original); Exh. 5 at 10 (emphasis in original); *see also* Exh. 6 at 13 ("the currently presented claims, limited to . . . compounds that are di-substituted in the 2'-position with two non-hydrogen substituents").) Fatal to Gilead's position is the fact that fluorine is a "non-hydrogen substituent" falling squarely within the "core of the invention." Accordingly, not only does the prosecution history fail to suggest that fluorine is excluded from the claim scope, but, rather, it demonstrates that fluorine is encompassed by the core concept.

The Patent Office agreed with applicants' characterization of the "core of the invention," allowing the claims because "[t]he use of the 2' branched substituted pyrimidine nucleoside

[3] As discussed later in this Section, both parties contend that this term (like certain others) further requires two non-hydrogen substituents at the 2' up and down positions (which is not in dispute). But that is the result of prosecution history statements that show inclusion of fluorine, not exclusion.

compounds of the invention to treat the hepatitis C virus is seen as novel or unobvious over the closest prior art of record[.]" (Exh. 7, Notice of Allowance at 2.) It is precisely this notice of allowance and the above-cited portions of the prosecution history that led not only Idenix, but also Gilead, to offer a construction requiring "two non-hydrogen substituents in the 2'-position." Gilead's attempts to carve fluorine out of the first part of its own construction and out of the "core of the invention" finds absolutely no support in the prosecution history.

Indeed, during prosecution, the Patent Office rejected a claim that included non-hydrogen substituents at the 2' position in view of U.S. Patent No. 6,348,587 disclosing fluorine at either the 2' up or down positions. (Exh. 8 at 3.) After applicants added claim 25 (then pending as claim 183), they distinguished all then-pending claims (including claim 25) ***not*** by arguing that fluorine was outside the scope of the claims, but by arguing that: (1) the prior art compound is not di-substituted at the 2' position "as presently claimed" (it had only one non-hydrogen substituent, fluorine); and (2) other di-substituted compounds actually disclosed were only precursors in the synthesis of the compound having fluorine at the 2' position. (Exh. 6 at 13.) Given the opportunity to distinguish the claims from prior art on the basis that fluorine at the 2' down position is not covered, the applicants passed. This confirms there was no disclaimer of fluorine at the 2' down position.

The specification does not support Gilead's efforts to exclude fluorine either. Gilead's primary argument is that the specification does not list fluorine as an example at the 2' down position. But the Federal Circuit has repeatedly held that silence does not equal disavowal of claim scope. *See, e.g., Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1400 (Fed. Cir. 2008) (agreeing with district court's conclusion that "[a]lthough the patent does not include financial service companies in its lists of *examples* of internet access providers . . ., that does not mean that

such companies *cannot* be providers. An invention is not limited to its examples.") (emphasis in original).[4] Decisions from this district are consistent with Federal Circuit precedent. For example, in *LG Philips LCD Co. v. Tatung Co.*, No. 04-343-JJF, 2007 WL 5787789, at *8 (D. Del. June 15, 2007), the Court held that "the mere absence of a description of alternative embodiments in the common specification . . . does not . . . rise to the level of 'words of manifest exclusion or restriction.'" *See also Honeywell Int'l, Inc. v. Nikon Corp.*, 589 F. Supp. 2d 433, 446 (D. Del. 2008) ("Rather, the '371 patent, instead of criticizing oblique lens arrays, stays silent on the topic. Such silence is not a sound basis on which to limit claims.").

While it is true that "an inventor may use the specification to intentionally disclaim or disavow the broad scope of a claim . . .[,] this intention must be clear[.]" *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1357 (Fed. Cir. 2006). The specification must do far more than simply be silent – it must criticize the feature allegedly disclaimed,[5] use words to the effect that "the present invention" is limited to a particular embodiment,[6] or expressly define a term to

[4] *See also InterDigital Commc'ns, LLC v. U.S.I.T.C.*, 690 F.3d 1318, 1328 (Fed. Cir. 2012) (rejecting argument that when conception documents show multiple embodiments and the specification only discloses one, the omitted embodiments are excluded – "the inventors' failure to include a reference to the alternative embodiment in the specification does not justify excluding that embodiment from the coverage of the claims"); *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1357 (Fed. Cir. 2004) ("the district court apparently interpreted the specification's silence regarding alternative embodiments as a disavowal. However, the applicant's choice to describe only a single embodiment does not mean that the patent clearly and unambiguously disavowed other embodiments."); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (requiring "explicit disclaimer[,]" not just the "mere absence of any reference to [a] structure in the specification[,]" to limit claim scope). *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1368 (Fed. Cir. 2002) ("In short, Life Fitness cannot use the intrinsic evidence's silence to narrow the ordinary meaning of an unambiguous claim term.").

[5] *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC.*, 677 F.3d 1361, 1372 (Fed. Cir. 2012) (the "specification['s] . . . repeated derogatory statements . . . may be viewed as a disavowal of that subject matter from the scope of the Patent's claims").

[6] *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F. 3d 1121, 1136-37 (Fed. Cir. 2011) ("in some circumstances, a patentee's consistent reference to a certain limitation or a preferred

exclude a particular feature.[7] None of these is present in the specification or prosecution history of the ’054 patent. To the contrary, the intrinsic evidence makes clear that the “core of the invention” is “two non-hydrogen substituents at the 2’ position,” which ***includes*** – rather than excludes – fluorine.

Gilead’s attempt to read in a limitation that excludes fluorine is a perfect example of its litigation-driven, result-oriented approach to claim construction. Fluorine is the only undisclosed substituent that Gilead attempts to exclude. The reason for Gilead’s arbitrary exclusion of fluorine, but not any other undisclosed substituent, is transparent: the accused compound specifically has fluorine at the 2’ down position. Gilead is simply trying to build a non-infringement defense. Gilead’s flawed reasoning (which is to specifically exclude fluorine because it is not disclosed) is the very sort that the Federal Circuit has repeatedly rejected.[8]

In sum, this term has a plain and ordinary meaning that does not exclude fluorine at the 2’ down position. The intrinsic record contains no “words of manifest exclusion” to specifically and arbitrarily exclude fluorine at the 2’ down position. Indeed, the intrinsic record clearly indicates that “non-hydrogen substituents” at the 2’ down position (such as fluorine) are included within the scope of this term. Accordingly, Idenix respectfully requests that its proposed construction be adopted.

(continued…)

embodiment as ‘this invention’ or the ‘present invention’ can serve to limit the scope of the entire invention, particularly where no other intrinsic evidence suggests otherwise”).

[7] *GE Lighting Solutions, LLC. v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (finding that in order to depart from the plain and ordinary meaning, the specification “must ‘clearly set forth a definition of the disputed claim term,’ and ‘clearly express an intent to define the term’” that disavows subject matter) (citation omitted).

[8] *See, e.g.*, *Liebel-Flarsheim*, 358 F.3d at 906-08 (refusing to limit the claims to the disclosed preferred embodiments); *see also* cases cited in footnote 4.

**B. β-D-2'-C-branched pyrimidine ribonucleoside ('054 Patent – Claim 26)**

| Idenix's Proposed Construction | Gilead's Proposed Construction |
|---|---|
| A β-D-pyrimidine ribonucleoside having a non-hydrogen substituent at the 3' down position and two non-hydrogen substituents at the 2' position, at least one of which is connected at the 2' position through a carbon-to-carbon bond. | A β-D pyrimidine nucleoside with a non-hydrogen substituent at the 2' up position that is connected at the 2' position through a carbon-to-carbon bond, and hydroxyl groups at the 2' down and 3' down positions. [To the extent the term is not construed to require a hydroxyl group at the 2' down position, the construction should specify that there is no fluorine in the 2' down position.] |

This term is identical to the prior term with one difference – this phrase uses the term "ribonucleoside" instead of "nucleoside." The principal dispute relates to the scope of non-hydrogen substituents that can be present at the 2' and 3' down positions. Gilead's primary argument is that OH must be at those positions, but to the extent the Court disagrees, Gilead maintains "the construction should specify that there is no fluorine in the 2' down position." Idenix contends that the term requires non-hydrogen substituents at the 2' and 3' down positions; those positions are not limited to OH, nor is fluorine excluded as an option at 2' down.

As an initial matter, the fact that Gilead felt compelled to offer a back-up construction (*i.e.*, no fluorine at the 2' down position) to its primary construction requiring OH at the 2' and 3' down positions is a tacit admission that its primary construction is weak. It is weak for good reason – none of the intrinsic evidence supports Gilead's primary construction.

Starting with the claims, when applicants wanted to limit a compound to OH at the 2' and 3' down positions, they did so expressly. For example, claims 1-24 of the '054 patent claim compounds that expressly require OH at the 2' and 3' down positions. (Exh. 1.) But claim 26 does not require OH at those positions. (*Id.*) The fact that claims 1-24 expressly require OH at the 2' and 3' down positions, and claim 26 does not, is strong evidence that applicants did not intend claim 26 to be limited to OH at the 2' and 3' down positions.

The specification further supports Idenix's construction. The overwhelming majority of compounds disclosed in the '054 patent specification are not limited to OH at the 2' and 3' down positions. (*See, e.g.*, '054 pat., Exh. 1, Compound XI at 10:10-54 and 21:37-22:13; Compound XVI at 11:41-12:17 and 24:5-44; Compound XVII at 12:22-64 and 29:1-41; Compound XVIII at 13:1-38 and 32:52-33:25; "2'-C-Branched ribonucleosides" at 47:6-24; and columns 56-156 disclosing dozens of compounds without OH at the 2' and 3' down positions.) Indeed, as shown below, when the specification uses the ***exact*** term in dispute – "2'-C-Branched ribonucleosides" – it does so without limiting that term to OH at the 2' and 3' down positions:

2'-C-Branched ribonucleosides of the following structure:




wherein BASE is a purine or pyrimidine base as defined herein;

$R^7$ and $R^9$ are independently hydrogen, $OR^2$, hydroxy, alkyl (including lower alkyl), azido, cyano, alkenyl, alkynyl, Br-vinyl, —C(O)O(alkyl), —C(O)O(lower alkyl), —O(acyl), —O(lower acyl), —O(alkyl), —O(lower alkyl), —O(alkenyl), chlorine, bromine, iodine, $NO_2$, $NH_2$, —NH(lower alkyl), —NH(acyl), —N(lower alkyl)$_2$, —N(acyl)$_2$;

(Exh. 1 at 47:6-23.) OH (*i.e.*, hydroxyl) is one example at the 2' and 3' down positions, but not the only one as required by Gilead's first construction.

In view of the foregoing, the specification – the "single best guide to the meaning of a disputed term" – clearly supports Idenix's construction. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc). By limiting this term to OH at the 2' and 3' down positions, Gilead has excluded the large majority of preferred embodiments disclosed in the '054 patent, which runs contrary to Federal Circuit precedent. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d

1576, 1583 (Fed. Cir. 1996) (holding that construing claims to exclude preferred embodiments "is rarely, if ever, correct and would require highly persuasive evidentiary support").

Similarly, the prosecution history supports Idenix's proposed construction. As already noted with respect to the first disputed term, applicants repeatedly advised the Patent Office that "the core of the invention" is "<u>two non-hydrogen</u> substituents in the 2'-position." (*See, e.g.*, Exh. 4 at 11; Exh. 5 at 10) (emphasis in original). Applicants reinforced this notion near the end of the prosecution:

> In view of the currently presented claims, ***limited to*** methods for the treatment of hepatitis C virus infection in a host using β-D pyrimidine ***compounds that are di-substituted in the 2'-position with two non-hydrogen substituents***, Applicants respectfully request that a Notice of Allowance be issued in this case.

(Exh. 6 at 13) (emphasis added). The "currently presented claims" included claim 26 (then pending as claim 184). Moreover, when claim 26 was added during prosecution, the applicants stated that support for this claim can be found on page 66 of the application, which discloses a "2'-C-Branched ribonucleoside" that was not limited to OH at the 2' and 3' down positions. (Exh. 6 at 11; Exh. 9 at 66.) Accordingly, the prosecution history could not have been clearer – the disputed term is not limited to OH at the 2' and 3' down positions.

Extrinsic evidence further supports Idenix's construction. For example, Gilead's own patent applications directed to methods for treating HCV describe "ribonucleosides" as including compounds with something other than OH at the 2' down position. Indeed, they expressly refer to fluorine, the principal substituent that Gilead wants to exclude:

> The present invention specifically discloses the potent anti-HCV activity of the 2'-methyl-2'-F-***ribonucleosides***, with the fluorine in the "down" (***ribo***) position.

(Exh. 10, Application No. 60/474,368 at 3) (emphasis added). Similarly, Gilead's U.S. Patent No. 7,601,820 discloses "ribonucleosides" that are not limited to OH at the 2' and 3' down

positions. (Exh. 11 at 20:4-10 (disclosing "ribonucleosides" with methyl up and fluorine down at 2' position as having "certain advantages.") Perhaps most significant is Gilead's U.S. Patent No. 7,429,572 (at issue in the co-pending Section 146 Action – Case No. 1:14-cv-00109-LPS), which characterizes an Idenix patent application having substantially the same specification as the '054 patent as disclosing "2'-methyl-2'-X-ribonucleosides, where X is a halogen . . . ."[9] (Exh. 12 at 5:39-48.) Gilead, therefore, represented to the world that compounds of the type disclosed in the '054 patent that are not limited to OH at the 2' and 3' down positions are nevertheless ribonucleosides. Such statements cannot be reconciled with Gilead's arguments to this Court. In view of Gilead's own patents and applications, Gilead cannot credibly maintain that "ribonucleosides" are limited to OH at the 2' and 3' down positions.

Even Gilead's own experts testified in prior litigation between the parties that ribonucleosides are not limited OH at the 2' and 3' down positions. With respect to the formula below, Gilead's expert Dr. Wnuk testified in a Patent Office proceeding that the illustrated compound having fluorine and another non-OH substituent at the 2' and 3' down positions was nonetheless a ribonucleoside:




Figure 1: Compound 5

[9] In this patent, Gilead also notes in its self-serving interest of criticizing a competitors' patent that "fluorine is not considered," but for the foregoing reasons the fact that fluorine is not listed does not require exclusion of fluorine from the scope of the claims. (Exh. 12 at 5:48.)

(Exh. 13 at 14:5-10.) Dr. Wnuk testified that two additional compounds not limited to OH at the 2' and 3' down positions were also ribonucleosides. (Exh. 13 at 18:12-16, 20:15-20.)

Gilead ignores the overwhelming amount of intrinsic and extrinsic evidence that supports Idenix's proposed construction (including its own unequivocal representations that ribonucleosides are not limited to OH at the 2' and 3' down positions), and instead focuses on ***natural*** ribonucleosides, which do have OH at the 2' and 3' down positions. But the '054 patent is not directed to natural ribonucleosides. Rather, the '054 patent is directed to ***modified*** ribonucleosides that replace or add substituents that would normally be present in a natural ribonucleoside.[10] Indeed, that is the whole point of the invention. On the cover of the '054 patent, the abstract states that the invention is directed to "modified nucleoside[s]." (Exh. 1.) All of the examples disclosed in the '054 patent include substitutions that are not present in natural nucleosides or ribonucleosides.[11] Claims 1-27 require methyl or another carbon-to-carbon bond at the 2' position (Gilead agrees), which are not present in a natural ribonucleoside. Accordingly, claim 26 (and this term in particular) is not limited to natural ribonucleosides, as Gilead would have this Court believe. Any extrinsic definition of ribonucleoside that suggests that OH is required at 2' and 3' down is totally irrelevant, as such definitions refer to natural ribonucleosides, not the modified ribonucleosides that are the subject of the '054 patent and its

[10] Gilead's expert agrees with this meaning of modified nucleosides and ribonucleosides. (Exh. 14 at 195:2-12 ("Modified means that the part of the, part of the basic structure of [the] nucleoside is change[d] . . . . Modification can be made basically on any place on [a] nucleoside[.]").)

[11] *See, e.g.*, '054 pat., Exh. 1, Compound XI at 10:10-54 and 21:37-22:13; Compound XVI at 11:41-12:17 and 24:5-44; Compound XVII at 12:22-64 and 29:1-41; Compound XVIII at 13:1-38 and 32:52-33:25; "2'-C-Branched ribonucleosides" at 47:6-24; and columns 56-156 disclosing dozens of modified nucleosides and ribonucleosides.

claims. *See Phillips*, 415 F.3d at 1322-23 (extrinsic evidence may not be used to contradict intrinsic evidence).

With respect to Gilead's back-up construction requiring exclusion of fluorine at the 2' down position, such a construction should be rejected for all the same reasons discussed above with respect to the first term where Gilead is attempting to exclude fluorine.

In view of the foregoing, this disputed term is not limited to OH at the 2' and 3' down positions (nor is fluorine excluded at the 2' down position), but rather includes OH, fluorine and other such non-hydrogen substituents at those positions.

### C. β-D-2'-methyl-ribofuranosyl nucleoside ('597 Patent - Claim 1)

| Idenix's Proposed Construction | Gilead's Proposed Construction |
|---|---|
| A β-D-nucleoside that includes a five member sugar ring with a methyl group in the 2' up position and non-hydrogen substituents at the 2' down and 3' down positions. | A β-D-nucleoside that includes a five member sugar ring with a methyl group in the 2' up position and hydroxyl groups at the 2' down and 3' down positions. [To the extent the term is not construed to require a hydroxyl group at the 2' down position, the construction should specify that there is no fluorine in the 2' down position.] |

This term is similar to the previous one (β-D-2'-C-branched ribonucleoside) except instead of requiring a "C-branch" at the 2' position, it specifically requires methyl at the 2' position. Also, instead of reciting a "ribonucleoside," it recites a "ribofuranosyl nucleoside." The term "furanosyl" is well-understood to specify that the sugar ring is a five-membered ring, which is accounted for by both parties' construction.

As with the second term, the only dispute here relates to the scope of substituents that can be present at the 2' and 3' down positions. Idenix contends those substituents must be non-hydrogen. Gilead's primary construction requires OH at those positions and its back-up position excludes fluorine at the 2' down position. For all the reasons outlined above with respect to the second term, Idenix respectfully requests that its proposed construction be adopted.

### D. nucleoside ('054 Patent - Claim 24; '597 Patent – Claim 1)

| Idenix's Proposed Construction | Gilead's Proposed Construction |
| --- | --- |
| A compound comprising a base linked to a sugar. | A compound comprising base and sugar moieties, with a hydroxyl group at the 5' position. |

The primary dispute is whether the term "nucleoside" as used in the claims requires OH at the 5' position. It does not. The '054 and '597 patent specifications provide the most compelling support for Idenix's construction. Indeed, all nucleosides disclosed include a base linked to a sugar (Idenix's construction), but the overwhelming majority are not limited to OH at the 5' position (Gilead's construction). (*See, e.g.,* '054 pat., Exh. 1, Compound XI at 10:10-54 and 21:37-22:13; Compound XVI at 11:41-12:17 and 24:5-44; Compound XVII at 12:22-64 and 29:1-41; Compound XVIII at 13:1-38 and 32:52-33:25; and columns 56-156 disclosing dozens of "nucleosides" without OH at the 5' position.)[12] By limiting "nucleoside" to OH at the 5' position, Gilead has once again excluded the large majority of preferred embodiments, which runs contrary to Federal Circuit precedent. *See Vitronics*, 90 F.3d at 1583.

In addition to these examples, the '054 and '597 patent specifications consistently use the term "nucleoside" in a manner that is not limited to OH at the 5' position. For example, in describing the "General Synthesis of 2'-C Branched ***Nucleosides***," the '054 and '597 patent specifications disclose a number of substituents at the 5' position, only one of which is OH. (Exh. 1 at 47:5-42) (emphasis added). Similarly, the '054 and '597 patent specifications state that "[t]he active ***nucleoside*** can also be provided as a 5'-phosphoether lipid or a 5'-ether lipid," which are nucleosides having something other than OH at the 5' position. (Exh. 1 at 39:48-51)

[12] The '597 patent is a continuation of the '054 patent. Accordingly, this same evidence is in the specification of the '597 patent, but will not be specifically cited here. It should be understood throughout this brief that all evidence cited to in the '054 patent specification is also present in the '597 patent specification.

(emphasis added). Accordingly, the specification clearly supports Idenix's construction, while Gilead's proposed construction ignores the specification in its entirety.

The prosecution history further supports Idenix's construction. During prosecution, claims were presented for "nucleosides" wherein numerous substituents other than OH were attached at the 5' position:

Claim 146 (new): A method for the treatment of a hepatitis C virus infection in a host, comprising administering an anti-virally effective amount of a β-D nucleoside compound of formula:




$R^1$ is independently H; phosphate; stabilized phosphate prodrug; acyl; alkyl; sulfonate ester and benzyl, wherein the phenyl group is optionally substituted with one or more substituents; a lipid; an amino acid; a carbohydrate; a peptide; a cholesterol; or other pharmaceutically acceptable leaving group which when administered *in vivo* is capable of providing a compound wherein $R^1$ is independently H or phosphate; and

(Exh. 5, 8/26/2003 Amendment at 7.) Moreover, when claim 25 of the '054 patent was added during prosecution, the applicants stated that support for this claim can be found on page 66 of the application, which discloses a nucleoside that was not limited to OH at the 5' position. (Exh. 6 at 11; Exh. 9 at 66.) Accordingly, not only does the specification consistently use the term "nucleoside" to refer to compounds having something other than OH at the 5' position, the prosecution history does as well.

The claims also support Idenix's construction. In particular, when applicants wanted to limit a nucleoside to OH at the 5' position, they did so expressly. For example, claims 1-24 of the '054 patent claim "nucleosides" that expressly require OH at the 5' position. But, claim 25

does not require OH at the 5' position. The fact that claims 1-24 expressly require OH at the 5' position, and claim 25 does not, is strong evidence that applicants did not intend claim 25 to be limited to a nucleoside with OH at the 5' position.

Extrinsic evidence, including Gilead's own patents directed to methods for treating HCV, supports Idenix's construction as well. For example, Gilead's U.S. Patent No. 7,601,820 discloses "nucleosides" with something other than OH at the 5' position:

> In other aspects, the present invention provides methods to prepare nucleosides containing the 2-deoxy-2-fluoro-2-C-methyl-D-ribofuranosyl moiety of general structures of III and IV,



III



IV

> and $R^3$ and $R^5$ can be independently H, Me, Acyl (such as Ac, Bz, substituted Bz), benzyl, substituted benzyl, Trityl, Trialkylsilyl, t-Butyldialkylsilyl, t-Butyldiphenylsilyl, TIPDS, THP, MOM, MEM, or $R^3$ and $R^5$ are linked through —$SiR_2$—O—$SiR_2$— or —$SiR_2$—, wherein R is a lower alkyl group such as Me, Et, n-Pr or i-Pr.

(Exh. 11 at 9:64-10:25; *see also* Gilead's U.S. Patent No. 7,964,580 (entitled "Nucleoside Phosphoramidate Prodrugs"), Exh. 15 at Abstract, 1:6-7, 4:9-12.)

Even Gilead's own proposed constructions in the present cases support Idenix's construction of "nucleoside." The first and third terms – "β-D-2'-methyl-ribofuranosyl ***nucleoside***" and "β-D-2'-methyl-ribofuranosyl ***nucleoside***" – include the term "nucleoside." Yet, Gilead offers constructions for these terms that do not require OH at the 5' position.

Gilead's constructions are, therefore, inconsistent and recognize (at least for two of the terms) that nucleosides are not limited to OH at the 5' position.

Another difference between the parties' constructions (albeit less significant) is that Idenix's construction requires "a base linked to a sugar," whereas Gilead's construction requires "a base and sugar moieties." Gilead has not defined the term "sugar moieties." Accordingly, Gilead's proposed construction would require the Court to conduct further analysis and possible construction of "sugar moieties." For this reason alone, Gilead's proposal to include "sugar moieties" in the construction instead of simply "sugar" should be rejected.

In view of the foregoing, Idenix respectfully requests that its proposed construction for this term be adopted.

### E. administering ('054 Patent - Claims 25 And 26; '597 Patent – Claim 1; '600 Patent - Claim 1)

| Idenix's Proposed Construction | Gilead's Proposed Construction |
|---|---|
| Making available. | Providing externally. A metabolite of an administered compound that is created by in vivo transformation is not administered. |

The principal dispute here is whether this term excludes administration of compounds inside the body (*e.g.*, through *in vivo* transformation), as Gilead contends.[13] It does not. Gilead is attempting to limit the form of the compounds administered to those that exist outside the body in pre-ingested form, such as a pill. But none of the evidence supports such a narrow construction. Once again, Gilead is attempting to read in a negative limitation to build a non-infringement defense.

One need look no further than the claim language to conclusively determine that

[13] This is the one term that is present in claims from both patent families. The argument is combined here for the Court's convenience. While the construction of this term in either family is independent of the other family, the intrinsic evidence from each respective family leads to the same construction.

"administering" covers metabolites provided *in vivo*. For example, claim 1 of the '600 patent recites that the substituent at the 5' position ($R^1$) can be "a pharmaceutically acceptable leaving group ***which when administered in vivo*** provides a compound wherein $R^1$ is H or phosphate[.]"[14] (Exh. 3, claim 1) (emphasis added). The term "*in vivo*" refers to a process taking place "within the living body" and is the antithesis of "providing externally." (Exh. 16.) Accordingly, the express language of the '600 patent claims covers precisely what Gilead attempts to exclude: providing metabolites created by *in vivo* transformation. This evidence alone is sufficient to resolve this dispute in Idenix's favor.

The '054, '597 and '600 specifications also support Idenix's proposed construction. For example, each of the specifications expressly disclose that the claimed compounds are not only those that exist outside the body, but also those that are metabolized in the body:

> The ***compounds of this invention*** either possess antiviral (i.e., anti-HCV) activity, or ***are metabolized to a compound*** that exhibits such activity.

(Exh. 1 at 15:38-40; Exh. 2 at 15:48-50; Exh. 3 at 109:64-67) (emphasis added). Similarly, the Asserted Patents expressly disclose that compounds of "the present invention" include not only those administered externally, but those that are administered internally through metabolism:

> Pharmaceutically acceptable prodrugs refer to ***a compound that is metabolized***, for example hydrolyzed or oxidized, in the host ***to form the compound <u>of the present invention</u>***.

(Exh. 1 at 39:2-5; Exh. 2 at 39:5-8; Exh. 3 at 109:54-57) (emphasis added). The '600 patent also discloses that the parent of prodrugs (*i.e.*, those compounds metabolized in the host) are covered by the "invention":

[14] Similarly, the specifications of the Asserted Patents also describe the disclosed compounds as being capable of being administered *in vivo.* (*See*, *e.g.*, Exh. 1 at 10:38-41; Exh. 2 at 10:38-41; Exh. 3 at 105:1-4.)

> ***The invention*** further provides at least one of the described 2' and 3'-prodrugs in combination or alternation with a second nucleoside that exhibits activity against a Flaviviridae, ***including but not limited to a parent drug of any of the prodrugs*** defined here . . . .

(Exh. 3 at 38:50-54.) Each of these disclosures makes clear that "administering" does not exclude providing metabolites created by *in vivo* transformation as Gilead contends. To the contrary, that is precisely the type of administration contemplated by the Asserted Patents.

Idenix's proposed construction is also supported by the context of the surrounding words of the claims. *See, e.g., ACTV, Inc. v. Walt Disney Co.,* 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms."). The relevant claims require "administering" to a "***host***." (Exh. 1, claims 25 and 26 ("administering to said host"), Exh. 2, claim 28 ("administered to a host") and Exh. 3, claim 1 ("administering to the host").) All three Asserted Patents consistently define the term "host" as follows:

> The term host specifically refers to ***infected cells***, ***cells transfected with all or part of the HCV genone and animals***, in particular, primates (including chimpanzees) and humans.

(Exh. 1 at 38:50-53; Exh. 2 at 38:54-57; Exh. 3 at. 109:36-39) (emphasis added).

Taking the claim language as a whole, in combination with the definition of "host," it is clear that "administering" is not limited to "providing externally" as Gilead argues. Indeed, inserting Gilead's proposed construction and the definition of "host" into the claim language results in: "providing externally to infected cells." That makes no sense, as it is impossible to "provide externally" to infected cells located internally. On the other hand, "making available" the claimed compound to "infected cells, cells transfected with . . . the HCV genome and animals" makes perfect sense. Given the definition of "host," the only reasonable conclusion is

that "administering" encompasses providing externally ***and*** internally. Gilead's proposed construction reads the term "host" out of the claims.

Idenix's proposed construction of "making available" is supported by the plain and ordinary meaning of the term "administering" as well. The definition of this term is: "to deliver", "to give" or "to apply." (Exh. 17 at 3). Each of these definitions is consistent with Idenix's construction. None, however, exclude *in vivo* transformation as argued by Gilead.[15]

Well-established law also supports Idenix's proposed construction. *See, e.g., Merck & Co. v. Teva Pharms. USA, Inc.*, 47 F.3d 1367, 1371 (Fed. Cir. 2003) (holding that a claim "directed to a method of treatment" by "administering an effective amount of the specified biphosphonic acid[,]" was not limited to pre-ingested form where "the acid is the active agent and . . . the acid is administered when it is in the form of the [pre-ingested] salt."); *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 348 F. Supp. 2d 713, 730 (N.D. W. Va. 2004) (rejecting construction that excludes *in vivo* production of the claimed compound: "[w]hether levofloxacin formed as the claimed compound inside the body or outside the body, as long as it is given remedially as medicine, then levofloxacin has been administered"); *Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1421-22 (Fed. Cir. 1994) (finding that a compound claim covers compounds formed in a patient's body after ingestion: "[W]hile the claim as issued is limited to [a specified] crystalline form . . . it is not limited to the compound in its pre-ingested form . . . ."); *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1381 (Fed. Cir. 2003) (claims directed towards compounds "broadly encompass compounds defined by structure only. Such bare compound claims include within their scope the recited compounds as chemical

---

[15] Idenix views "making available", "delivering," and "providing" as synonyms in the present context and would accept "delivering" or "providing" as a proper construction. Gilead's error is in adding the adverb "externally" to these terms.

species in any surroundings, including within the human body as metabolites of a drug.").[16]

In view of the foregoing, the plain and ordinary meaning of the term "administering" as well as the intrinsic evidence and well-established law support Idenix's proposed construction.

**F. leaving group ('600 Patent - Claims 1 And 50)**

| Idenix's Proposed Construction | Gilead's Proposed Construction |
|---|---|
| A moiety that includes one or more atoms that are cleaved, *i.e.*, a prodrug moiety. | An atom or group of atoms that is cleaved in its entirety from the administered compound. |

The primary dispute with respect to this '600 patent term is whether it requires one or more atoms to be removed in their "entirety" (as Gilead claims) or whether less than all atoms can depart during *in vivo* administration (as Idenix claims). Gilead's attempts to read in yet another limitation ("in its entirety") finds no support in the intrinsic or extrinsic evidence.

As the title of the '600 patent makes clear, it is directed to, among other things, methods for treating *flaviviridae* infections (such as HCV) with pharmaceutically acceptable prodrugs. (Exh. 3.) A pharmaceutically acceptable prodrug as used in the '600 patent refers to "a compound that is metabolized, for example hydrolyzed or oxidized, in the host to form the compound of the . . . invention." (Exh. 3 at 109:54-57.) This definition of prodrug was well-understood to one of ordinary skill in the art at the time of the invention. (*See, e.g.*, Exh. 18, V.J. Stella, et al., "Prodrugs. Do They Have Advantages in Clinical Practice?," *Drugs 29*, 455-473 (1985) at 455 (explaining that prodrugs are "derivatives of a drug molecule that require a

[16] In a currently pending case between Gilead and Idenix's parent (Merck & Co., Inc.), Gilead also attempted to construe "administering" to exclude *in vivo* transformation. *Gilead Sciences, Inc. v. Merck & Co.*, No. 13-CV-04057-BLF, 2015 WL 2062575, at *4 (N.D. Cal. May 1, 2015). As the Court noted, "Gilead contends that 'administration is complete at the point when the patient swallows a tablet . . . [and] does not extend beyond [] to encompass whether and how the body transforms a drug.'" *Id.* The Court rejected this argument, finding that the disputed term "necessarily includes what happens once a prodrug enters the patient's body and transforms through metabolism[.]" *Id.*

transformation within the body in order to release the active drug").) Prodrugs were often used to assist in the delivery of compounds used for treating viruses at the time of the invention. (Exh. 3 at 8:53-59.)

Consistent with these well understood principles, the '600 patent claims, *e.g.*, methods for treating hosts infected with HCV using nucleoside prodrugs. The relevant claim language is provided below:




(Exh. 3, claim 1.) The language "a pharmaceutically acceptable leaving group which when administered *in vivo* provides a compound wherein $R^1$ is H or phosphate," simply refers to a prodrug moiety. The "leaving group" language contained therein simply refers to transformation within the body of all or part of the substituents to provide a compound, including active compounds, wherein $R^1$ is H or phosphate. In other words, the leaving group includes one or more atoms that are cleaved, which in the context of a prodrug is commonly referred to as a prodrug moiety. Gilead does not dispute that the moiety at the 5' position in the relevant claims includes one or more atoms that are cleaved during *in vivo* administration. Gilead's construction essentially says as much. However, in another results-oriented construction, Gilead reads in a limitation requiring the group of atoms to be cleaved "in its entirety." Nothing in the intrinsic record supports this added limitation.

The language of the claims defies Gilead's attempts to read the language "in its entirety" into the claims. The claims recite that when the compound is administered *in vivo*, the 5' moiety "provides a compound wherein $R^1$ is H or phosphate." (Exh. 3.) Accordingly, the claims

expressly contemplate that when a prodrug having a phosphate moiety at the 5' position is administered *in vivo*, the phosphate at the 5' position remains at the 5' position, even though other atoms bonded to it react or depart. In other words, some of the atoms of the group are changed, but not all of the atoms, which wholly contradicts Gilead's proposed construction.

The '600 patent specification also supports Idenix's proposed construction. It discloses that prodrugs can be administered "to increase the activity, bioavailabilty, stability or otherwise alter the properties of the nucleoside." (Exh. 3 at 110:44-45.) The specification further discloses numerous "known" prodrugs having a moiety at the 5' position where some atoms are changed when administered *in vivo*, but not all are (*e.g.* phosphate is not), which again contradicts Gilead's construction. (*See generally* Exh. 3 at 111:35-113:21.) Such "non-limiting examples" are incorporated by reference into the '600 patent, examples of which are attached at Exhibits 19-21 with relevant portions highlighted.[17] An example of one of these numerous disclosed prodrugs where some atoms are cleaved from the 5' moiety, but phosphate remains (as claimed by the '600 patent) is shown below:




(Exh. 20 at 4; *see also at* 6-7).

Gilead's proposed construction reads the prodrugs disclosed in the '600 patent, and others, entirely out of the claims. But as the '600 patent recognizes, prodrugs of the type disclosed and claimed by the '600 patent had been around for many years, and widely used as

[17] *See* Exh. 19 at 6113-14; Exh. 20 at 4, 6-8; Exh. 21 at 99-103.

precursors of active nucleosides for treating viruses. For example, Dr. McGuigan reported in numerous articles in the 1990s that phosphate prodrugs have enhanced antiviral efficacy relative to the parent nucleoside analogue. (*See, e.g.,* Exh. 22 at 1183 ("phosphate . . . prodrugs . . . appear to have enhanced antiviral efficacy relative to the parent nucleoside analogue").) Gilead's own patents recognize the wide use of phosphate prodrugs to treat viruses, including Dr. McGuigan's work:

> Nucleoside phosphoramidate prodrugs have been shown to be precursors of the active nucleoside triphosphate and to inhibit viral replication when administered to viral infected whole cells (McGuigan, C. et al., *J. Med. Chem.* 1996, 39, 1748-1753) . . . .

(Exh. 15, U.S. Pat. No. 7,964,580 at 4:9-13).

By requiring the atoms of the leaving group to be cleaved in their entirety, Gilead's construction requires that a phosphorous atom bonded to the oxygen at the 5' position would also be cleaved, rather than providing a phosphate as claimed. Gilead's construction is contrary to the claim language, the specification and widely reported literature, and should be rejected.

Gilead's proposed construction is once again a transparent attempt to build a non-infringement defense. The accused product includes a prodrug moiety where not all atoms are cleaved during *in vivo* administration. Indeed, like the examples in the '600 patent, the phosphate attached at the 5' position remains after *in vivo* administration. This is the driving force behind Gilead's attempts to insert the "in their entirety" limitation. It finds no support in the intrinsic or extrinsic evidence and, therefore, should be rejected.

## **CONCLUSION**

For the foregoing reasons, Idenix asks that the Court to adopt Idenix's proposed constructions for the disputed terms and phrases.

ASHBY & GEDDES

/s/ *Andrew C. Mayo*

Steven J. Balick (#2114)
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
amayo@ashby-geddes.com

*Attorneys for Plaintiffs*

*Of Counsel*:

Calvin P. Griffith
Ryan B. McCrum
Michael S. Weinstein
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939

Anthony M. Insogna
John D. Kinton
JONES DAY
12265 El Camino Real, Suite 200
San Diego, CA 92130
(858) 314-1200

John M. Michalik
JONES DAY
77 West Wacker
Chicago, IL 60601
(312) 782-3939

Dated: June 23, 2015